## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ST. JAMES STEVEDORING PARTNERS, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 13-541** |
| **MOTION NAVIGATION LTD.,** *in personam* **and M/V GEORGITSI, IMO No. 9590113, her engines, tackle, apparel, furniture, equipment and all other appurtenances,** *in rem* | **SECTION: "S"** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff and defendant-in-counter-claim, St. James Stevedoring Partners, LLC, filed this suit against defendants, Motion Navigation Ltd., in personam,[1] and M/V GEORGITSI, IMO No. 9590113, her engines, tackle, apparel, furniture, equipment and all other appurtenances, in rem, alleging negligence in connection with an allision that resulted in  one of St. James' buoys being severed from its anchor chain.  St. James seeks: $18,243.50 for costs incurred as a result of the buoy damage; $87,601.90 in mooring fees for providing initial docking and undocking; $55,167 for services provided by assist tugs; $7,732.50 for assisting the M/V GEORGITSI in repairing the port anchor windlass; and $143,750 in detention and damage charges.  In the alternative, St. James, as a provider of services to the M/V GEORGITSI, asserts a maritime lien against the M/V GEORGITSI for necessaries provided to the vessel.

Motion and the M/V GEORGITSI contend that they were not negligent.  Motion asserts a counter-claim against St. James alleging that St. James' negligence caused the allision.  Motion claims damages in the amount of $98,022.74, which includes $42,378.01 in physical damages to the

---

[1] Motion is also a plaintiff-in-counter-claim.

vessel, $20,091.39 in additional charges that were incurred in New Orleans, and $35,553.28 in lost charter hire.[2]

The case was tried as a bench trial, and memoranda supporting the parties' respective positions were submitted to the court.

## DISCUSSION

### I.  Background

St. James operates and maintains three mid-stream mooring berths on the left descending bank of the Lower Mississippi River near Mile 158.  The upper and lower berths have buoy sets of three buoys at the bow of the vessel and two at the stern.  The middle buoy set had two buoys at the bow, and two at the stern.  In the mooring process, vessels are maneuvered between the buoys, the anchors are set, and then mooring lines are tied to the buoys.  Each buoy has a pad eye on its underside to which its anchor chain is connected, and the anchor chain is secured to a pile driven into the river bed.

The M/V GEORGITSI, a vessel owned by Motion, and operated by Efshipping Co., S.A., was built in 2012.  On March 9, 2013, the M/V GEORGITSI left the Grandview Anchorage in the Mississippi River and proceeded to St. James to be moored at the middle buoy set for cargo discharge operations.  When the vessel departed the Grandview Anchorage, the anchor windlasses were fully operational and were used to heave the anchors before the journey began.  The vessel was under the command of Captain Filippos Fasilis, and being piloted by Captain David Shirah, Jr., a

---

[2] St. James filed a motion to file an amended answer asserting that Efshipping, Co., S.A., not Motion, is the real party in interest for Motion's damage claims (Doc. #61).  In response, Motion filed stipulations and ratifications from the United Kingdom Mutual Steam Ship Association (Doc. #61) and Efshipping Co., S.A. (Doc. #62) stating that they agree to be bound by any decision in this action as if they had been joined as plaintiffs.  At trial, St. James indicated that the stipulations resolved the motion. (Doc. #66, p. 23).  Therefore, St. James' motion is moot.

compulsory Mississippi River pilot assigned call sign NOBRA 99. When Captain Shirah took the helm, he and Captain Fasilis discussed proposed maneuvers and mooring plans. Captain Shirah has piloted ships on the Mississippi River since 1996, and has brought vessels into the St. James mooring buoys hundreds of times. Captains Shirah and Fasilis knew of the existence and location of the mooring buoys before they started the mooring operation. Captains Shirah and Fasilis remained on the bridge wheelhouse or wings during the mooring process, and there were five crew members on the forward deck. Two sailors were assigned to ready the vessel's bow mooring lines. The Chief Mate was assigned to the bow of the boat and his job, as assigned by Captain Shirah, was "to talk on the radio." According to Captain Fasilis, he relayed information between the pilot and the crew through the Chief Mate, whose job it was to give distances to Captain Fasilis and to give the crew instructions as they were issued by Captain Fasilis. The vessel's crew used personal UHF radios for this communication, so that they would not interfere with the pilot's communication with the line handling boat or the tugboats on the on channel 77 of the VHF radios. The M/V GEORGITSI also had a VHF radio that was tuned to Channel 67, which is the navigation channel.

Two tug boats owned and operated by Crescent Towing, the M/V MISSISSIPPI and the M/V MARGARET F. COOPER, assisted in the mooring operation. The M/V MISSISSIPPI, operated by Captain Mark St. Germain, was secured to the port bow portion of the M/V GEORGITSI, while the M/V MARGARET COOPER, operated by Captain Carl Gengenheimer, was secured to the starboard bow portion. Captain Shirah communicated with the tug captains using his VHF radio tuned to Channel 77.

A line handling vessel, the LH-3, owned by St. James and operated by its employee Captain Tony Gomez, also assisted with the mooring operation. Captain Gomez was a certified line handler.

Also aboard the LH-3 were St. James' Operations Manager, Patrick Muscarello, as an observer, and three line handlers.  During the mooring operation, there was a crew change, and two of the line handlers were replaced with two others.  None of the line handlers were certified.  The LH-3 has an open deck without any cabin or enclosure. The line handlers aboard the LH-3 were responsible for receiving the mooring lines from the M/V GEORGITSI and securing them to the buoys.  Also, Captain Gomez was responsible for providing Captain Shirah with the distances of the M/V GEORGITSI from the outer and inner mooring buoys, because the mooring buoys were in a blind spot from the vessel's bridge where Captain Shirah was operating the vessel. Captains Gomez and Shirah communicated via VHF radios tuned to Channel 77.

The usual procedure for mooring a vessel at the St. James middle berth is to set the port anchor first, which would be dropped when the vessel was approximately 25 feet upriver and 100 feet towards the center of the river from the outer mooring buoy on the vessel's starboard side. Then, the tugs would help the vessel maneuver between the inner mooring buoy and the river bank to set the starboard anchor at or below and inshore of that mooring buoy.  The vessel would then travel backwards below both forward mooring buoys and set its anchor chains at the proper tension. Thereafter, the mooring lines were passed to the line handlers who would secure them to the buoys.

During the mooring of the M/V GEORGITSI, the vessel dropped her port anchor outside of the outer mooring buoy, fell back and to her starboard side, then began moving forward and to her starboard side to drop the starboard anchor.  The port anchor windlass was paying out anchor chain link-by-link in accordance with the pilot's instructions.  At this point, Captain Shirah lost communication with Captian Gomez, and communication was not reestablished until after the vessel had gone too far upriver and "overshot" the inner mooring buoy.  The port anchor chain was taut.

The vessel moved downriver and away from the bank, closer to the port anchor that was set in the river.  The anchor chain sagged and engaged with the buoy's anchor chain when the vessel was falling back into position.  The vessel's port anchor chain became entangled with the inner mooring buoy's anchor chain, causing the pad eye to break.  The buoy was set adrift in the river and the anchor chain fell to the river bottom. At this point, the M/V GEORGITSI's port anchor windlass broke, and the vessel could not heave the anchor.

The United States Coast Guard was informed of the incident and ordered the two assist tugs to remain with the vessel.  The USCG lifted the tug restriction at 1:00 p.m. on March 10, 2013, and all remaining restrictions were lifted on March 13, 2013.

At 1:12 a.m. on March 10, 2013, Captain Fasilis emailed St. James and indicated that the vessel was ready to discharge.  At 9:58 a.m. on March 10, 013, St. James indicated that it would not discharge the M/V GEORGITSI in the middle berth and ordered the vessel to vacate the berth by 1:15 p.m. that afternoon to be brought to the upper berth to begin discharge operations.  The vessel's local agent, Captain Elias Katsaros, informed St. James that the vessel could not vacate the middle berth because of the broken port anchor windlass, and St. James responded that St. James would charge the $5,000 per hour tariff for any time the vessel remained in the middle berth beyond when she was ordered to vacate it.

The vessel interests decided to repair the port anchor windlass by using another hydraulic motor made by the same manufacturer that was being used in one of the deck winches.  This required the use of a crane.  At 3:57 p.m. on March 10, 2013, Captain Katsaros requested that St. James provide a crane to assist in the repair operation.  St. James replied that it did not have a crane available, and Captain Katsaros could not find another in the area.  At 10:29 p.m. St. James informed

Captain Katsaros that it would have a crane free in about an hour, and that the charge was $1,500 per hour with a minimum of four hours usage.  The crane came along side the M/V GEORGITSI at 1:30 a.m. on March 11, 2013, was used in the repair operation and departed at 2:35 a.m. By 5:30 p.m. on March 11, 2013, the port anchor windlass was operational.  Eventually, a new motor was ordered from the manufacturer to replace the one taken from the deck mooring winch.

At 6:30 a.m. on March 12, 2013, the M/V GEORGITSI was made fast in the upper berth and discharge operations began.  The discharge was completed on March 14, 2013 at 3:35 a.m., and the vessel departed the upper berth at 9:25 a.m. St. James commenced repairs to the middle anchor buoy at 1:30 p.m.  St. James was able to recover the buoy and its anchor chain from the river bottom and reattach the buoy.

As a result of the allision, St. James seeks: $18,243.50 for costs incurred as a result of the buoy damage; $87,601.90 in mooring fees for providing initial docking and undocking; $55,167 for services provided by assist tugs; $7,732.50 for assisting the M/V GEORGITSI in repairing the port anchor windlass; and $143,750 in detention and damage charges.   Motion seeks damages in the amount of $98,022.74, which includes $42,378.01 in physical damages to the vessel, $20,091.39 in additional charges that were incurred in New Orleans, and $35,553.28 in lost charter hire.

## II.  Legal Standards

### A.  Maritime Negligence, <u>The Oregon</u> Rule and <u>The Pennsylvania</u> Rule

This court must decide whether <u>The Oregon</u> Rule and <u>The Pennsylvania</u> Rule, two rebuttable presumptions in admiralty law, apply to this case.  St. James urges the court to invoke <u>The Oregon</u> Rule and apply a rebuttable presumption that the M/V GEORGITSI is at fault for the allision because it was in motion when it came in contact with the stationary buoy.  St. James also urges the

court to apply The Pennsylvania Rule, and apply a rebuttable presumption that the M/V GEORGITSI's alleged failure to comply with Rules 5 and 6 of the Inland Rules of Navigation caused the allision.

### 1. Maritime Negligence

To prevail on a negligence claim under admiralty law, the plaintiff must prove: (1) that the defendant owed it a duty; (2) the defendant breached that duty; (3) the breach was the cause-in-fact and legal cause of plaintiff's damages; and, (4) actual damages. In re Mid-S. Towing Co., 418 F.3d 526, 531 (5th Cir. 2005); see also 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-2 (2d ed. 1994).  In admiralty cases, the standard of care is established by statutes or regulations[3], maritime custom, or by the general principles of negligence law. S.C. Loveland, Inc. v. E. W. Towing, Inc., 608 F.2d 160, 165 (5th Cir. 1979); see also 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-2 (2d ed. 1994) ("In admiralty the duty of care may be derived from three basic sources: (1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence."). If "two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." United States v. Reliable Transfer Co., 95 S.Ct. 1708, 1715-16 (1975).

---

[3] When a statute or regulation "creates a minimum standard of care . . .  then an unexcused violation, an act done with less than minimum care," is negligence per se. Dougherty v. Santa Fe Marine, Inc., 698 F.2d 232, 234-35 (5th Cir. 1983) (quoting Lowe v. Gen. Motors Corp., 624 F.2d 1373, 1381 (5th Cir. 1980)). "The failure to follow any Coast Guard regulation which is the cause of an injury establishes negligence per se." Id. at 235 (citing Kernan v. Am. Dredging Co., 78 S.Ct. 394, 401 (1958); Reyes v. Vantage S.S. Co., 609 F.2d 140, 143 (5th Cir. 1980)).  However, if the regulation contains an ambiguous or contradictory standard, the common law standard of reasonable care under the circumstances applies. Id.

### 2.  **The Oregon Rule**

There are presumptions and burden-shifting principles that govern the imposition of liability for allisions on navigable waterways.  Under The Oregon Rule, it is presumed that a moving vessel is at fault when it allides with a stationary object. The Oregon, 15 S.Ct. 804, 807 (1895).  Thus, the owner of a stationary object that is hit by a moving vessel can satisfy its initial burden of demonstrating the breach of a duty on the part of the vessel by invoking The Oregon Rule. Id. "This presumption operates to shift the burden of proof – both the burden of producing evidence and the burden of persuasion – onto the moving ship." Am. Petrofina Pipeline Co. v. M/V SHOKO MARU, 837 F.2d 1324, 1326 (5th Cir. 1988) (citing Delta Transload, Inc. v. M/V NAVIOS COMMANDER, 818 F.2d 445, 449 (5th Cir. 1987); James v. River Parishes Co., Inc., 686 F.2d 1129, 1131-33 (5th Cir. 1982)).  The vessel can rebut the presumption by proving, by a preponderance of the evidence, that the stationary object was at fault for the allision, that it acted with reasonable care, or that the allision was an unavoidable accident. Id. (citing Bunge Corp. v. M/V FURNESS BRIDGE, 558 F.2d 790, 795 (5th Cir. 1977); Delta Transload, 818 F.2d at 449; James, 686 F.2d at 1132; Woods v. U.S., Dep't of Transp., 681 F.2d 988, 990 (5th Cir. 1982)).  The Oregon Rule "presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." Id. (citing Delta Transload, 818 F.2d at 449; Bunge, 558 F.2d at 795). As the United States Court of Appeals for the Fifth Circuit explained:

> Such accidents simply do not occur in the ordinary course of things
> unless the vessel has been mismanaged in some way.  It is not
> sufficient for the respondent to produce witnesses who testify that as
> soon as the danger became apparent everything possible was done to
> avoid an accident.  The question remains, How then did the collision
> occur?  The answer must be either that, in spite of the testimony of
> the witnesses, what was done was too little too late, or if not, then the

> vessel was at fault for being in a position in which an unavoidable collision would occur.

Delta Transload, 818 F.2d at 449-50 (quoting Patterson Oil Terminals, Inc. v. THE PORT COVINGTON, 109 F.Supp. 953, 954 (E.D.Pa. 1952)).

### 3.  **The Pennsylvania** Rule

Under The Pennsylvania Rule, when at the time of a collision, a ship

> is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster.  In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

The Pennsylvania, 86 U.S. 125, 136 (1874).

"Although in its original form the rule of The Pennsylvania applied only to collisions between ships, it has been extended in [the Fifth Circuit] to apply to a variety of maritime accidents and to parties other than vessels." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1472 (5th Cir. 1991) (citations omitted).  "Thus, the rule has been reformulated to apply to any 'statutory violator' who is a 'party to a maritime accident.'" Id. (citing Sheridan Transp. Co. v. United States, 834 F.2d 467, 476 (5th Cir. 1987)).

This presumption allocates the burden of proof regarding causation to the party in violation of the statute.[4] Pennzoil Producing, 943 F.2d at 1472; see also Candies Towing Co., Inc. v. M/V

---

[4] In Mid-S. Towing, 418 F.3d at 531 n. 5, the United States Court of Appeals for the Fifth Circuit explained the relationship between The Oregon Rule and The Pennsylvania Rule:

> It is important to distinguish at the outset between the presumption of *fault* announced in The Oregon and the presumption of *causation* announced in The Pennsylvania; the latter case holding that a vessel in violation of a statutory rule designed to prevent collisions bears the burden of showing "not merely that her fault might not have been one of the causes, or that is

B&C ESERMAN, 673 F.2d 91, 93 (5th Cir. 1982) (The Pennsylvania Rule "constitutes an evidentiary rule reversing the burden of proof.").  However, The Pennsylvania Rule "is not pressed to literal extremes for it does not go so far as to say that 'every [party] guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination, have had a causal relation to the collision, no matter how speculative, improbable or remote.'" Gele, 574 F.2d at 248 (quoting China Union Lines, Ltd. v. A.O. Anderson & Co., 364 F.2d 769, 782 (5th Cir. 1966)).  Moreover, the rule cannot "be pressed to such an extreme as to justify a division of damages when the accident was undoubtably due to the negligence of an offending vessel whose actions could not be anticipated." Dow Chem. Co. v. Dixie Carriers, Inc., 463 F.2d 120, 122 n. 5 (5th Cir. 1972) (quoting Webb v. Davis, 236 F.2d 90, 93 (4th Cir. 1956)).

The Pennsylvania Rule "does not fix liability" nor does it "determine a party's ultimate share of the liability for a  loss." Pennzoil Producing, 943 F.2d at 1472.  "If a party fails to carry the burden imposed on it by the rule, the rule does not require that party to bear 100% of the

---

probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). *Compare* SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 14-3, at 104-05 (classifying the rule of The Oregon as a "presumption of fault" akin to the common law doctrine of res ipsa loquitor "primarily applicable in allision cases," which "creat[es] a rebuttable presumption of *negligence* on the part of a party who is in exclusive control of an instrumentality with regard to a mishap that ordinarily does not occur in the absence of negligence") (emphasis added), *with* id. at § 14-3, at 101 (classifying the rule of The Pennsylvania as not establishing a rule of fault but as being "limited to *causation*") (emphasis added), *and* DAVID W. ROBERTSON ET AL., ADMIRALTY & MARITIME LAW IN THE UNITED STATES 384 (2d ed. 2001) (describing the rule of The Pennsylvania as creating "a strong presumption that the statutory violation was a *cause in fact* of the accident," and distinguishing this rule from the common-law concept of negligence per se famously applied in Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.)).

(emphasis in original) .

responsibility for the allision.  Liability still must be apportioned according to the comparative fault of the parties." Id.

St. James argues that the M/V GEORGITSI violations of Rules 5 and 6 of the Inland Rules of Navigation were the sole cause of the allision.

Rule 5 provides: "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate under the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." 33 C.F.R. § 83.05. St. James contends that the M/V GEORGITSI's crew should have been stationed at the bow of the vessel and instructed to give the pilot distances during the mooring operation.

Rule 6 provides:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.
>
> In determining a safe speed the following factors shall be amount those taken into account:
>
> (a) By all vessels:
>
> (i)    The state of visibility;
>
> (ii)   The traffic density including consideration of fishing vessels or any other vessels;
>
> (iii)  The manageability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
>
> (iv)   At night, the presence of background light such as from shore lights or from back scatter from her own lights;
>
> (v)    The state of wind, sea and current, and the proximity of navigational hazards;

(vi)     The draft in relation to the available depth of water.

(b)  Additionally, by all vessels with operational radar:

(i)      The characteristics, efficiency and limitations of the radar equipment;

(ii)     Any constraints imposed by the radar range scale in use;

(iii)    The effect on radar detection of the sea state, weather and other sources of interference;

(iv)     The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

(v)      The number, location and movement of vessels detected by radar;

(vi)     The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

Id.§ 83.06. St. James argues that the M/V GEORGITSI was moving too fast during the mooring operation, which caused the allision.

### 4.  Evidentiary Presumptions and Evidence

The Oregon Rule and The Pennsylvania Rule are evidentiary presumptions, which permit the trier of fact, "in the absence of other evidence, . . . [to] have a solid, . . ., basis" to determine whether a party was negligent or whether the party's actions proximately caused an accident. Rodi Yachts, Inc. v. Nat'l Marine, Inc., 984 F.2d 880, 887 (7th Cir. 1993)  Such "[e]videntiary presumptions, . . . , are designed to fill a vacuum.  Once evidence is presented, . . ., presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." Mid-S. Towing, 418 F.3d at 532 (quoting Rodi Yachts, 984 F.2d at 887); see also GRIFFIN, THE AMERICAN LAW OF COLLISION, § 25, at 43 ("Such presumptions are, of

12

course, not rules of law or even evidence.  They merely express inferences of fact, based on experience and probabilities, and their only effect is to put upon the vessel subject to the presumption the burden of going forward with evidence to show that in the particular case, the inference is unwarranted." "The exact scope and operation of these prima facie presumptions are to cast upon the party against whom they operate, the duty of going forward in argument or evidence, on the particular point to which they relate.").

Both parties have presented evidence regarding fault and causation.  Therefore, the application of The Oregon Rule and The Pennsylvania Rule is not appropriate.  The fact-finder has heard all of the evidence upon which to make findings regarding fault and causation under the rules of admiralty negligence claims.

### 5.  Fault and Causation in the Allision

As discussed above, during the mooring operation on March 9, 2013, the port anchor chain of the M/V GEOGITSI became entangled with the anchor chain of the inner mooring buoy at St. James' middle berth.  The buoy's anchor chain was severed, and the M/V GEORGITSI's port anchor windlass broke.  St. James argues that the M/V GEORGITSI was at fault because the vessel's crew did not maintain a proper lookout and the vessel was moving too fast.  Motion and the M/V GEORGITSI argue that St. James was at fault because Captain Gomez failed to properly communicate with Captain Shirah, and should have had a redundant form of communication available when the VHF radio communication failed.

### a.  Patrick Muscarello's Testimony

Muscarello is St. James' Operations manager.  He was on the line handling vessel, the LH-3, during the mooring of the M/V GEORGITSI as an observer to ensure that the LH-3's crew change

went smoothly.  He stated that the LH-3 is approximately 18 to 20 feet long and that he was at most 10 feet away from Captain Gomez.  Muscarello testified that Captain Gomez was responsible for communicating distances to Captain Shirah and that he heard Captain Gomez doing so.  According to Muscarello, it appeared that Captain Shirah was hearing Captain Gomez because Captain Shirah was constantly asking for information and Captain Gomez was providing it, but sometimes it seemed like Captain Shirah did not hear Captain Gomez.  Further, Muscarello testified that there was a lot of radio traffic and it is possible that Captain Shirah did not hear some of the distances Captain Gomez called out.  Muscarello also testified that everyone on the line handling boat had a cellular telephone, but that nobody had Captain Shirah's cellular telephone number.  Muscarello, who has no maritime licenses, testified that the M/V GEORGITSI appeared to be moving faster than normal when it arrived, but he did not know how fast. Muscarello stated that the M/V GEORGITSI came to a stop for about 30 seconds after the anchor chain was above the buoy.  After the M/V GEORGITSI's port anchor chain and the buoy's anchor chain engaged, he heard a loud screeching sound, and then saw additional anchor chain come out.  Muscarello believes that the M/V GEORGITSI's port anchor windlass became inoperable was a result of the anchor chains' entanglement.  He does not recall the M/V GEORGITSI's horn blowing at any time during the mooring operation.

### b.  Captain Tony Gomez's Testimony

Captain Gomez testified that he has worked at St. James as a mechanic for four years.  He is also a boat pilot, has a current 100 ton master's license, and is a certified line handler.  During the mooring of the M/V GEORGITSI he could hear Captain Shirah on the VHF radio and understood that Captain Shirah could hear him giving distances, until communication was lost at some point.

He knew that the communication was lost because of the manner in which Captain Shirah was asking for distances. Captain Gomez tried to give Captain Shirah the distances, but it seemed like Captain Shirah could not hear him. Captain Shirah was talking continuously, preventing a person from communicating on the same channel. Captain Gomez testified that Captain Shirah and the tug captains "walked over" his radio communications, therefore Captain Shirah could not hear Captain Gomez giving distances. He testified that although he did not have Captain Shirah's cellular telephone number, he would not have called because it would have been a waste of time, because too much could happen in the time it would have taken to call. He testified that he should have asked for Captain Shirah's cellular telephone number before the mooring operation began because it was the continency plan for communication with the vessel if the VHF radios failed. He also testified that it was a windy day, the LH-3's VHF radio is exposed to the wind, and that wind can cause communication issues. Captain Gomez admitted that he had a hand held VHF radio in addition to the LH-3's radio and could have changed his hand held VHF to channel 77 when communication was lost, but did not. Captain Gomez thought that the M/V GEORGITSI was moving faster than other ships, it was not a "slow and easy," but rather than a steady move. He does not recall the M/V GEORGITSI's horn blowing at any time during the mooring operation.

### c.  Captain Mark St. Germain's Testimony

Captain Mark St. Germain testified that he has been employed at Crescent Towing for 32 years and is currently the captain of the tug M/V MISSISSIPPI. The M/V MISSISSIPPI has two VHF radios, one tuned to channel 77, for work communications, and the other to channel 67, which is the navigation traffic channel. As a tug captain, he aids vessel pilots in mooring operations and does what the pilot instructs him to do. He lets the pilot know that he has received the instruction

by repeating it as he is doing it.  Only one person at a time can communicate over the VHF radio.

Captain St. Germain testified that the pilot and the line handling boat had communication problems

during the entire operation.  He stated that the line handling boat was not answering Captain Shirah's

requests for distances and Captain Shirah had to ask two or three times to receive a response.

Captain St. Germain testified that the M/V GEORGITSI went upriver of the inner mooring

buoy, and as the tugs were bringing the vessel back down, additional slack from the port anchor

chain dropped in front of the buoy and caught it.  He thought even more anchor chain fell from the

vessel after it passed over the buoy, and if the chain stayed taut it would have passed back over the

buoy.  Captain St. Germain did not think that the allision could have been avoided by stopping the

mooring operation because it all happened so fast.  He testified that the M/V GEORGITSI was not

maneuvering any faster than a vessel normally would.  He does not recall the M/V GEORGITSI's

horn blowing at any time during the mooring operation.

### d.  Captain Joseph Bridges' Testimony - Plaintiff's Expert

The court accepted Captain Bridges as an expert in vessel navigation and mooring

operations.  He has a Bachelor of Science degree in Nautical Science from the California Maritime

Academy, and has held an unlimited master's license.  Captain Bridges has worked in the maritime

industry for about 40 years, and has worked on the Mississippi River.  He is familiar with the Inland

Rules of Navigation.

Captain Bridges opines that the crew of the M/V GEORGITSI did not maintain a proper

lookout and the vessel was not traveling at a safe speed.  He testified that the line handling boat and

the Chief Mate were responsible for giving distances to the pilot, and that there was a breakdown

in communication.  He opines that the allision would not have occurred if the Chief Mate were

16

providing distances to the captain.  Specifically, he testified "I would say it would be fair to say that if the linesmen and the foredeck were giving proper distances, this accident wouldn't have happened."

Captain Bridges also opines that, when communication with the line handling boat was lost, the pilot did not know where the buoy was, and was traveling at an unsafe speed because he had an obligation to stop and restore communication before attempting to drop the starboard anchor. Further, Captain Bridges opines that the crew was not properly operating the port anchor windlass in accordance with the pilot's instructions because there would have been more anchor chain in the water, and the vessel's anchor chain would not have become entangled with the buoy's anchor chain. Specifically, he testified "the fact that they didn't comply with the Pilot's instructions, that was the reason that the port anchor chain became so taut and gave the ability to go over the buoy when the vessel overshot the buoy."

Captain Bridges testified that the anchor chain paid out after it passed over the buoy as a result of the crew letting it out or the windlass spontaneously breaking.  However, he also admitted that if the vessel moved closer to the location where the anchor was set in the water, it would create slack in the anchor chain.  He opined that "there was some sort of defect that was not a major defect, and it slowly manifested itself every time they used the anchor, and at that time it gave way." Captain Bridges does not have any mechanical engineering training or expertise.

### e.  Captain David Shirah's Testimony

Captain Shirah has been a vessel pilot on the Mississippi River since 1996, and he has a master's license, first class pilot license, master of towing. He has piloted around 3,500 vessels on the river and has brought hundreds into the St. James anchorage. He boarded the M/V GEORGITSI

at the Grandview Anchorage and had a discussion with Captain Fasilis regarding the vessel.  His impression of the crew was that they were competent.   Captain Shirah testified that his communication equipment was working properly.  He instructed Captain Fasilis to have all of the crew stationed at the bow of the vessel during the mooring operation, and that he wanted the Chief Mate's only job to be communicating with the bridge and other crew members, and to be the primary lookout.  Captain Shirah testified that the line handling boat was responsible for spotting the vessel and giving distances.   Captain Shirah said that the job was "unremarkable" until he lost communication with the line handling boat.  He called them and did not get a response, and was worried about the "life and safety of those guys on that small boat."  He testified that he asked the tug captains if they could see the line handling boat.  His next communication with the line handling boat occurred after the M/V GEORGITSI overshot the buoy, and they said "hey, Captain, you are too high.  Your anchor chain is running over the buoy."  Thereafter, he backed the vessel out using the tugboats and "the port anchor chain went over the buoy and caught the way back and took out the starboard mooring buoy inshore."

Captain Shirah testified that this is an operation that is "highly dependent upon good communication" and he would have expected the line handling boat to have some sort of redundant communication.  Captain Shirah admonished the line handling boat for losing communication, but did not admonish the M/V GEORGITSI's crew for any reason.  He testified that "[t]he vessel's crew, the tugboats, the tugboat crew, we were all in the same game.  We were all in the loop.  We were all working together.  It [the line handling boat] was the one piece that was out of sync, out of the rest of us."  He also testified that the people on line handling boat "are the ones that provide the information directly to [him] as far as spot and position," because the vessel's crew would

18

communicate with him through Captain Fasilis as they work on a different radio frequency.  He testified that he did not tell the line handling boat how he wanted the distances, but "[a]s a matter of professionalism, it is understood [that the line handling boat would give distances].  It is part of the job on how you spot somebody. You should be singing those distances out at a regular interval as the vessel closes and maneuvers into position."  This is expected as an industry standard.  When communication is lost, the procedure is to try to reestablish it, then to sound the vessel's horn, and if that did not work, to stop the operation.  Captain Shirah did not stop the operation at any point.

Captain Shirah testified that he never lost control of the M/V GEORGITSI and that nobody ever told him that the vessel was moving too fast.

He testified that the M/V GEORGITSI's crew, two mates and all available deck crew, were forward, so he "would assume that there [are] enough people forward that the entire operation would have been visible from the bow of the ship."  He "would have an expectation that the crew would be aware of what was going on with the mooring buoys and the situation on the bow of the ship."  He testified that in hindsight, "[w]e could have done a hundred different things," and they "could have stopped and stabilized the vessel."

Captain Shirah testified that when he left the M/V GEORGITSI, the vessel was safely moored.  He thought that the vessel could have conducted cargo operations.

### f.   Captain Fillipos Fasilis' Deposition Testimony

Captain Fasilis received his degree from the Maritime Marine Academy in Greece in 1999, has a Captain Class C license, and has been a master of vessels for Efshipping since August 2012. He was the master of the M/V GEORGITSI on March 9, 2013.  When Captain Shirah boarded the M/V GEORGITSI, Captain Fasilis and Captain Shirah discussed the mooring procedure. The chief

mate, the bosun and three sailors were at the bow.  The bosun and one sailor were operating the anchor windlasses and the other two sailors were readying the mooring lines.  The Chief Mate was the officer in charge at the bow and had to communicate to the others to make sure the pilot's orders, as relayed by Fasilis, were followed.  The members of the vessel's crew communicate with each other using handheld UHF radios so that they do not interfere with the pilot's communication with the linesmen on the VHF radio.  No member of the M/V GEORGITSI's crew was located on the bow of the vessel and responsible for giving distances to the captain and pilot, but the Chief Mate was available as a lookout, and "[i]t is common sense that if he is in any danger, to report to the bridge, of course."

Captain Fasilis testified that the buoys and the line handling boat are in a blind spot and the linesmen are responsible for giving the pilot distances.  He testified that he and Captain Shirah could hear the linesmen at the beginning of the mooring operation, but when they were setting the starboard anchor, the linesmen stopped communicating with Captain Shirah. Captain Shirah got upset with the linesmen, and "kept asking for what he needed to do his job."

Captain Shirah never complained to Captain Fasilis that the M/V GEORGITSI's crew members were not doing their jobs or that the tugboats were acting improperly.  However, Captain Shirah did complain that the linesmen did not reply to him "because this was a critical situation of the maneuvering, and if we did not hear from them, we were going to have an accident."  Captain Fasilis did not have any complaints during the mooring process except as to the actions of the linesmen "because they did not give the correct distances to the pilot, and [they] had an accident because of that."  He thinks that the vessel overshot the buoy because of the lack of communication. Captain Fasilis testified that he is "100 percent sure that the pilot did blow the whistle when we

approach the starboard anchor and the linesman doesn't reply to him."  Captain Fasilis testified that Captain Shirah was very professional and did not seem that he was in a hurry to get the job done. Captain Fasilis thought that Captain Shirah "did a very good job during the mooring operation."

Captain Fasilis testified that the M/V GEORGITSI was traveling at normal, safe speed as it approached the St. James buoys.  The vessel was also maneuvering at a normal speed during the anchor setting process.  He testified that the maneuvering could not have been stopped when the communication was lost.

Captain Fasilis testified that the port anchor chain was paid out as instructed by the pilot and that there was no order to release more chain when the vessel was falling back after going too far upriver.  Captain Fasilis "saw additional anchor chain come out after it was placed tight from the entanglement with the buoy.  Only after the anchor became entangled with the buoy, it was extremely tight."  The port anchor windlass' hydraulic motor broke "[w]hen the anchor chain engaged with the buoy." He also testified that the port anchor windlass was operational when it heaved the anchor before the vessel left the Grandview Anchorage.  In order to save time, the hydraulic motor on the port anchor windlass was replaced with a hydraulic motor from another windlass on the vessel.

After the accident, a St. James foreman came to the M/V GEORGITSI's bridge.  Captain Fasilis told him that the vessel could begin cargo operations.  However, St. James refused to commence the cargo operations and ordered the M/V GEORGITSI out of the middle berth so that St. James could fix the buoy.  The buoy repair operation did not commence until two days after the vessel was moved.

21

### g.  Dimitrios Mandrochalos' Deposition Testimony

Dimitrios Mandrochalos was the Chief Engineer on the M/V GEORGITSI on March 9, 2013. He graduated from a Greek naval academy, and has worked at sea since 1971.  He has been a chief engineer aboard vessels since 1994, and has a current chief engineer's license.  Mandrochalos testified that on March 9, 2013, the M/V GEORGITSI's port anchor windless was approximately 15 months old, it received regular maintenance, and should have lasted 18 to 20 years.  The port anchor windlass was working properly prior to the anchor chain's coming in contact with the buoy's anchor chain.  He testified that when he inspected the broken part of the hydraulic motor, it was broken "[f]rom sudden overload of the system."

### h.  Eleftherios Makaris' Testimony

Makaris testified that he has worked at Efshipping, a vessel management company, since 1995, and he is currently the Assistant of Operations Department, the Deputy DPA and Crew Manager.  Efshipping manages the M/V GEORGITSI.  He testified that the crew of the vessel was fully competent to participate in mooring operations and that it was equipped with communication devices.  Makaris testified it is risky that to look down to the water from the bow of the vessel because one must lean over the side of the vessel to do so.

### i.  Conclusion Regarding Fault and Causation

The evidence presented establishes that the entanglement of the M/V GEORGITSI's port anchor chain with the buoy anchor chain which caused the port anchor windlass to break was caused because Captain Shirah did not receive information regarding the distance of the M/V GEORGITSI from the buoy.  The failure of Captain Shirah to receive the information was caused, in part, by a break down in communication between the line handling boat and the M/V GEORGITSI.  Captains

Shirah and Fasilis both testified that they could not hear distances being communicated from Captain Gomez at some point during the mooring operation. Captain St. Germain, Muscarello and Captain Gomez all testified that they knew communications between the parties were lost. Theories at to why Captian Shirah could not hear distance that Captain Gomez testified he was providing include that Captain Gomez's radio communications were "walked over" by others using the same radio frequency, that the wind prevented Captain Shirah from hearing Captain Gomez, or that there was an equipment failure. There is no evidence that establishes that one theory is more likely than the others.

The evidence also establishes that the Captain Gomez knew he should have had a redundant form of communication with Captain Shirah in case the VHF radio communication failed, but that he failed to do so. Captain Shirah testified that he would have expected the line handling boat to have some redundant form of communication in case of a failure of the VHF radio communication. Captain Gomez admitted that it was St. James' standard procedure for him to obtain the vessel pilot's cellular telephone number before beginning a mooring operation, but that he did not do so in this case. Captain Gomez also admitted that he had another radio that he could have used to contact Captain Shirah, but that he did not do so. Therefore, St. James was at fault for failing to implement a redundant means of communication to contact Captain Shirah when it became clear that the VHF radio communication between the line handling boat and the M/V GEORGITSI had failed at a critical time in the mooring operation.

Another cause of the failure to communicate proper distances was the failure of the M/V GEORGITSI's crew to verify the distances to Captain Shirah. Captain Shirah testified that he would have expected the vessel's crew to be aware of difficulty with the mooring lines and buoys. Further,

Captain Fasilis testified that the Chief Mate was an available lookout, but did not communicate distances back to the bridge.  Further, Captain Bridges opined that  "I would say it would be fair to say that if the linesmen and the foredeck were giving proper distances, this accident wouldn't have happened."  The court finds that the crew of the M/V GEORGITSI was at fault for failing to provide a proper lookout.

The court finds that the weight of the testimony establishes that the M/V GEORGITSI was not moving at an improper speed.  Captains Shirah, Fasilis and St. Germain all testified that the vessel was moving at a normal speed during the mooring operation.  Although Muscarello and Captain Gomez testified that they thought the vessel was moving too fast, they are not as experienced as Captains Shirah, Fasilis and St. Germain.  Captain Bridges testified that it was his opinion that the M/V GEORGITSI was moving too fast, but he was not present at the scene.  The court finds that the speed of the M/V GEORGITSI was not a factor in the allision.

Further, the testimony establishes that the operation could not have been stopped to avoid the allision. Captains Fasilis and St. Germain testified that the operation could not have been stopped until communications were restored.  Captain Shirah stated that stopping the operation was possible in hindsight, but there is no indication that the allision could have been avoided because the communication was lost after the M/V GEORGITSI overshot the buoy.  The court finds that stopping the operation after the communication breakdown was not an available option to prevent the allision, and thus not a cause of the allision.

Further, the court finds that the port anchor windlass broke as a result of the impact of the port anchor chain with the buoy's anchor chain.  Muscarello testified that he heard a loud screeching sound and saw additional anchor chain come out after the M/V GEORGITSI's port anchor chain and

the buoy's anchor chain engaged. Muscarello also testified that he believed that the M/V GEORGITSI's port anchor windlass became inoperable as a result of the anchor chains' entanglement. Captain Fasilis testified that he could see the port anchor windlass, knew that it was being properly operated and thought that it broke after the entanglement. Moreover, Mandrachalos, who has 40 years of experience as a vessel engineer, testified that after he viewed the broken parts, he thought that a sudden impact caused the damage. Captain Bridges opined that the port anchor windlass must have had a hidden defect that slowly manifested itself and broke at that moment. This opinion is undermined by the fact that the port anchor windlass was only a little over a year old, had consistent maintenance, and had a life expectancy of 18 to 20 years. Further, Captain Bridges has not engineering training or expertise. The court concludes that the port anchor windlass broke as a result of the impact.

In sum, the court finds that one cause of the allision was Captain Shirah's lack of communication regarding the M/V GEORGITSI's distance from the buoys. St. James' linesmen were primarily responsible for providing such distances. The court allocates 60% of the fault for the accident to St. James due to its failure to have a redundant means of communication with the vessel's pilot when the VHF radio communication failed. Motion and the M/V GEORGITSI are allocated 40% of fault for the allision for not providing a lookout on the vessel when Captain Shirah needed assistance in receiving communication as to the distance from the vessel to the buoy.[5]

_____

[5] Defendants seek an adverse inference against St. James for their failure to produce a line handling check list for the LH-3 in relation to the M/V GEORGITSI mooring procedure. A sample copy of the line handling checklist is Exhibit 9. It is a list of many features of the line handling boat that should be checked before a mooring procedure. One item is "VHF Radio - functions correctly, #77/#17." Captains Shirah and Fasilis testified that they received initial communications from the LH-3, which indicates that the "VHF Radio" box would have been checked. There is no indication that such a checklist would impact this court's determination that both parties were at fault for the loss of communication, and an adverse inference will not be applied.

### III. Damages[6]

#### A.  St. James

St. James seeks $18,243.50 for costs incurred as a result of the buoy damage; $87,601.90 in mooring fees for providing initial docking and undocking; $55,167 for services provided by assist tugs; $7,732.50 for assisting the M/V GEORGITSI in repairing the port anchor windlass; and, $143,750 in detention and damage charges.  In the alternative, St. James asserts a maritime lien against the M/V GEORGITSI for necessaries provided to the vessel for the tug services, initial docking and undocking and mooring fees, and crane charges for the windlass repair.

##### 1.  Damage to the buoy

St. James has established that it incurred expenses of $18,243.50 in repairing damages to the buoy. This represents $15,000 paid to Weber Marine and $3,243.50 paid to River Services. Morton testified that time was of the essence in retrieving the buoy's anchor chain from the river bottom because it could have become lost in the muddy river bottom.  St. James hired Weber Marine to do the work.  For a day or two after the accident St. James thought that Weber needed only the middle berth clear to do the salvage operation.  After the M/V GEORGITSI was moved to the upper berth, Weber informed St. James that both the upper and middle berths needed to be clear.  St. James then discharged the M/V GEORGITSI as quickly as possible using as many cranes as possible. Weber charges a flat fee of $15,000 per day, regardless of whether the customer supplies its own tug boat.  Weber successfully retrieved the buoy's anchor chain and reattached the buoy after 8 or 10 hours. St. James paid Weber $15,000 for the work. Weber worked with a diver from River Services

---

[6] At trial, the parties stipulated to the amounts of each others damages, but dispute their respective liabilities.

who charged $3,230 for the job.  St. James is awarded $18,243.50, less a 60% reduction based on St. James' percentage of fault.

### 2.  Unpaid Services Provided to the M/V GEORGITSI

St. James argues that it is entitled to recover the amounts related to unpaid services it provided to the M/V GEORGITSI, including $87,601.90 in mooring fees for providing initial docking and undocking; $55,167 for services provided by assist tugs; $7,732.50 for assisting the M/V GEORGITSI in repairing the port anchor windlass.  Motion and the M/V GEORGITSI argue that they do not owe these charges because the time spent at the middle berth was a waste of time due to St. James' refusal to conduct cargo discharge operations, which Motion and the M/V GEORGITSI contend was safe.

In the alternative, Motion and the M/V GEORGITSI argue that the mooring fees for providing the initial docking and undocking and assist tugs are not recoverable by St. James if the linesmen were at all at fault for the allision because that would mean that they breached the implied warranty of workmanlike performance.  Motion and the M/V GEORGITSI also argue that the dockage fees should be reduced for St. James' delay in providing a crane to assist with the anchor windlass repair.  Further, they argue that St. James should not be permitted to recover the detention and damages charge because St. James' imposition of the $5,000 per hour tariff was unreasonable in this case.

### a.  Recovery of Dockage Fees and Assist Tug Fees

#### i.  Safety of Discharge Operations at Middle Berth

##### A.  Muscarello's Testimony

Muscarello testified that he was concerned that discharging the cargo on the M/V GEORGITSI was unsafe when the vessel was in the middle berth because it was only tied to one

buoy, which does not provide the security needed to ensure that the vessel will not shift and sway. Also, the angle and position of the vessel was problematic because the vessel was not straight in the current, which would place additional forces on the port side.  Further, the vessel was too close to the barge fleet on the riverbank and there would not have been room for a tug boat to pass with a crane and barge against the M/V GEORGITSI.  The owner of the barge fleet would not permit the M/V GEORGITSI to be discharged in this position, and St. James cannot discharge a vessel if the barge fleet owner will not provide the barges.

### B.  Captain Bridges' Testimony

Captain Bridges opined that it was unsafe to discharge the vessel because it was tied to only one buoy, the port anchor windlass was inoperable, and the vessel was at a 20 degree angle in the current.

### C.  Paul Morton's Testimony

Paul Morton is St. James' President.  He testified that the M/V GEORGITSI was not safe to discharge with an inoperable port anchor while tied to only one buoy at the bow because there were multiple forces pushing the ship inshore, such as the wind and wake, and in that condition, the vessel would not have been able to pull itself away from the shore.  There was concern that the vessel would have allided with the barge fleet and set some barges adrift.  Morton also testified that St. James' cranes are huge and there was concern that putting the discharging equipment up to the M/V GEORGITSI would "change the dynamics of the ship" in the berth with only one fore buoy and an inoperable port anchor windlass.  He was not actively involved in the decision not to discharge the M/V GEORGITSI, but supported the decision of his team that it was not safe.

### D.  Captains Shirah and Fasilis

Both Captains Shirah and Fasilis testified that they thought the vessel was safe to discharge in the middle berth.  Captain Fasilis also testified that the vessel remained stationary in the berth and did not sway.

### E.  Conclusion Regarding Safety of Discharge in Middle Berth

The court finds that it was reasonable for St. James to conclude that it was unsafe to discharge the M/V GEORGITSI while she was in the middle berth.  Its employees and equipment would be in danger should the vessel move, and there was the potential for various forces to act upon and destabilize the vessel during a cargo operation while she was in the middle berth.  Cargo operations could not be conducted because there was only one fore buoy and the M/V GEORGITSI's port anchor windlass was inoperable.  Therefore, St. James' refusal to discharge the M/V GEORGITSI while she was in the middle berth was reasonable, and is not a basis to deny recovery for these charges.

### ii.  Application of the Implied Warranty of Workmanlike Performance to Charges of Dockage Fees and Assist Tug Fees

Motion and the M/V GEORGITSI argue that St. James cannot recover any of the mooring fees or assist tug fees related to the M/V GEORGITSI's time at the middle berth because St. James' linesmen breached the implied warranty of workmanlike performance when they failed to properly communicate with Captain Shirah during the mooring procedure.

Admiralty law recognizes an implied warranty of workmanlike performance ("WWLP") that arises from contractual relationships. Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n. 17 (5th Cir. 1989) (citing Ryan v. Pan-Atl. Steamship Corp., 76 S.Ct. 232, 237-38 (1956)).  It means "that the obligor in a service contract has a duty to perform his or her task with

reasonable care, skill, and diligence.  Thus the WWLP is a legal 'construct' that was originally rooted

in the concept of *negligence*." T. Shoenbaum, 1 <u>Admiralty and General Maritime Law</u> § 5-8 at 190

(2d ed. 1994) (emphasis original).

> As a contract doctrine, the WWLP is very much alive.  Between parties to a maritime contract there is generally an implied WWLP unless it is excluded by agreement.  The courts have applied the doctrine to a wide variety of marine contracts to perform services without supervision or control by the shipowner, such as repairs, offshore service contracts, contracts to provide tug assistance, launch service contracts and stevedoring contracts . . . [I]n order for the warranty to arise, the 'putative warrantor must be performing some type of service for the party asserting the warranty claim.

<u>Id.</u> at 192-93 (quotations and citations omitted).

Motion and the M/V GEORGITSI argue that pursuant to <u>Dillingham Tug & Barge Corp. v.</u>

<u>Collier Carbon & Chem. Corp.</u>, 707 F.2d 1086 (9th Cir. 1983), St. James cannot recover any of the

docking fees or the fees for the assist tugs if the linesmen were at all at fault in the allision.  In

<u>Dillingham</u>, 707 F.2d at 1091-92, a barge was lost at sea, and the towing company was found to be

60% at fault for the loss.  The court found that the towage contract included an implied warranty of

workmanlike performance, which was breached, and no fees were owed for the towing.  Motion and

the M/V GEORGITSI  argue that St. James had a duty to perform the line handling services in a

workmanlike manner, which was breached when they failed to properly communicate with Captain

Shirah, and as a result St. James should not be entitled to recovery for the line handling fee, the tug

boat fees or the dockage fees related to the M/V GEORGITSI's time in the middle berth.

The United States Court of Appeals for the Fifth Circuit has held that the "warranty of

workmanlike performance is not a proper basis for indemnity in a property damage action." 2-I

<u>Benedict on Admiralty</u> § 11 (2014).  In <u>Bosner v. Tug L.A. BARRIOS</u>, 796 F.2d 776, 785 (5th Cir.

1986), the court explained the history of the doctrine of a warranty of workmanlike performance in

maritime cases, and stated that in maritime property damage cases, proportional damages based on the degrees of fault is the general rule. Then, in Rockwell Int'l Corp. v. M/V INTCOTRANS SPIRIT, 998 F.2d 316, 319 (5th Cir. 1993), the court denied a vessel owner's indemnity claims against a stevedore and port authority "rejecting the application of the [doctrine of WWLP] in favor of comparative fault principles." (citation omitted).  The court recognized that the WWLP exists, but was "reluctant to expand it beyond the personal injury/seaworthiness context from which it arose." Id. (citation omitted).

The case at bar is a property damage case, and the principles of proportional fault apply, not the implied warranty of workmanlike performance. See Bosner, 796 F.2d at 785; Rockwell, 998 F.2d at 319.

### iii.  Reduction in Dockage Fees for Delay in Providing the Crane

Motion and the M/V GEORGITSI also argue that St. James' recovery for the dockage fee related to the M/V GEORGITSI's call to the middle berth should be reduced by an amount commensurate with the amount of additional time the vessel remained in the berth as a result of St. James' failure to timely provide a crane to assist with the windlass repair.  Motion and the M/V GEORGITSI contend that, in the normal course of operations, some of St. James' cranes would have been employed to discharge the M/V GEORGITSI's cargo and at least one of these cranes should have been available to aid in the windlass repair.

Morton testified that St. James did not have crane available for the M/V GEORGITSI to use in the crane repair operation when the ship's agent requested it because all eight of St. James' cranes were involved in cargo operations with the other vessels to discharge them as quickly as possible so that the buoy repair could begin.  When a crane became available, St. James rented it to the M/V GEORGITSI at a rate of $1,500 per hour with a minimum of four hours.  Morton testified that there

were services used that justify the mooring fees, such as the tug boats, the line handling services, and the use or availability of launch boats.  Morton's testimony establishes that St. James did not unreasonably withhold a crane from defendants' use in order to inflate the mooring fees.

### iv.  Conclusion Regarding Dockage Fees and Assist Tug Fees

The court finds that none of the theories asserted by Motion and the M/V GEORGITSI regarding the unrecoverability or reduction in the dockage and assist tug fees charged by St. James related to the vessel's call at the middle berth hold water.  Therefore, St. James is entitled to recover the $87,601.90 in mooring fees for providing initial docking and undocking and $55,167 for services provided by assist tugs, less a 60% reduction for fault attributable to St. James.

### b.  Repair of the M/V GEORGITSI's Port Anchor Windlass

St. James has established that it provided $7,732.50 in unpaid charges related to renting a crane to the M/V GEORGITSI to aid it in repairing the port anchor windlass.  Although this was a necessary charge incurred by the vessel, it would not have been required had the allision not occurred.  Therefore, it is entitled to recover $7,732.50 for this unpaid balance, less a 60% reduction for fault attributable to St. James.

### iv.  Detention Charge

St. James seeks $143,750 as a tariff for the time that the M/V GEORGITSI remained in the middle berth after it was ordered to leave on March 10, 2013.  The tariff provision of St. James' June 15, 2012, Changes in Fees Notification states:

> Any ship which refuses to vacate the St. James Stevedoring buoy system when so ordered, will be assessed a detention damages charge of $5,000.00 per hour it remains in berth following service of notice to vacate.  This detention damages charge will also apply to ships that St. James directs to vacate the buoy systems but are ordered to remain in berth by Governmental organizations due to mechanical or operating deficiencies in the ship.

> St. James Stevedoring reserves the right to order the ship out of
> the buoy system when, in our sole discretion, conditions (including,
> but not limited to hurricanes and tropical storms) could potentially
> result in damages to the buoys.  The ship must leave when ordered.
> All costs to leave the buoys and return will be for the account of the
> ship.

At 9:58 a.m on March 10, 2013, St. James ordered the M/V GEORGITSI to vacate the

middle berth by 1:15 p.m. that day.  The vessel did not vacate the berth until 1:50 a.m. on March 12,

2013.  Thus, St. James claims it is owed $5,000 per hour for 28.75 hours, which totals $143,759.

Whether stipulated damages in a maritime contract is an unenforceable penalty is a matter

of law, and it cannot be enforced if it is "so unreasonably large as to be a penalty." Int'l Marine,

L.L.C. v. Delta Towing, L.L.C., 704 F.3d 350,  354 (5th Cir. 2013).  The reasonableness of

stipulated damages is determined as follows:

> The first factor is the anticipated or actual loss caused by the breach.
> The amount fixed is reasonable if it approximates the actual loss that
> has resulted from a particular breach, even though it may not
> approximate the loss that might have been anticipated under other
> possible situations, or if the breach approximates the loss anticipated
> at the time of making the contract, even though it does not
> approximate the actual loss.  The second factor is the difficulty of
> proof of loss.  The greater difficulty of proof of loss, the more
> flexibility is allowed in approximating the anticipated or actual harm.

Farmers Export Co. v. M/V GEORGIS PROIS, 799 F.2d 159, 162 (5th Cir. 1986) (internal citations

omitted).

Morton testified that St. James charged defendants a $5,000 per hour tariff for 28.75 hours

for the time the ship was in the berth after it was asked to leave.  He stated that the amount was an

estimate of the cost of unused cranes and exposure to demurrage charges St. James would have if

a vessel stayed in the berth after it was asked to leave.  The amount of the tariff is based on the

assumption that St. James would be delayed from discharging another vessel, which would leave

the cranes inoperable resulting in lost income, and cause exposure to demurrage charges. Morton testified that there were no ships that St. James was unable to discharge because the M/V GEORGITSI was in the middle berth. Morton also testified that when St. James ordered the M/V GEORGITSI out of the middle berth on March 10, 2013, the plan was for the M/V GEORGITSI to move to the upper berth, but the vessel that was occupying it did not move until March 12, 2013. Further, at the time the M/V GEORGITSI was ordered to leave the middle berth, St. James thought that only the middle berth needed to be cleared for the buoy repair, and later found out that both the middle and upper berths needed to be clear. Morton testified that it is not St. James' practice and custom to charge the tariff when the delay in vacating the berth is caused by St. James.

The court finds that St. James' charging of the $5,000 per hour tariff was unjustified and is an unreasonable penalty in this case. Morton testified that there were no vessels waiting to be discharged at the middle berth when St. James ordered the M/V GEORGITSI to vacate. Thus, St. James was not exposed to any demurrage charges and it was not losing money with idle cranes considering Morton's testimony that all of St. James' cranes were engaged in cargo operations when the M/V GEORGITSI requested one to aid in the windlass repair. Therefore, it was unreasonable for St. James to charge the tariff in this case, and St. James may not recovery any of the charged tariff.

**B. Motion**

Motion claims damages in the amount of $98,022.74, which includes $42,378.01 in physical damages to the vessel, $20,091.39 in additional charges that were incurred in New Orleans, and $35,553.28 in lost charter hire.

### 1.   Physical Damages to the Vessel

Motion has proved that it incurred $42,378.01 in physical damages to the vessel as a result of the allision.  This amount includes: $7,103.28 for a technician to repair the windlass; $755 for a Vessel Data Recording technician; $9,450 for a replacement hydraulic motor; $1,766 for transporting the replacement hydraulic motor from South Korea to the Netherlands; $2,872.79 in agency fees related to the delivery of the replacement hydraulic motor; $9,932.86 in crew overtime, extra payments and consumables related the repair and replacement of the hydraulic motors; $3,513.14 for replacement lubricant; $1,000 for classification society expenses; $5,985 for marine surveyor expenses.

Mandrachalos testified that the hydraulic motor has a useful life of 18 to 20 years, which is an average of 19 years.  The motor was one year and three months old at the time of the allision. It is reasonable to assume that the broken motor's cost was comparable to the new one purchased only a year later.  Therefore, the cost of the new motor, $9,450, should be depreciated by 6.5% (15 months used / 228 months useful life), for a total of $8,835.75.  Thus, Motion's total damage claim is $41,763.76.  Motion is entitled to recover that amount, less 40% for fault attributable to it.

### 2.   Additional Charges Incurred

Motion also claims that it incurred $20,091.39 in extra charges in New Orleans as a result of the allision.  This included $19,141.39 in additional pilot expenses and $950 in additional agency expenses.  St. James does not dispute that the charges were incurred. Therefore, Motion is entitled to recover that amount, less 40% fault attributable to it.

### 3.   Lost Charter Hire

Motion cannot recover the $35,53.28 in lost charter hire because it has not proved that it has incurred these damages.  Makaris testified that the vessel's charterers have indicated that they are

going to deduct payments of $36,796.88 to reflect that the vessel was off hire for 3.7 days after the incident, however the charters have not yet deducted this amount.  There was correspondence indicating that the charterers would make the deduction, later that they decided not to, and then that they would if the vessel were at fault.  Because it is not clear that Motion actually lost the charter hire, this element of damages is not recoverable.

### C.  Interest

#### 1.  Pre-Judgment Interest

Both St. James and Motion claim that they are entitled to pre-judgment interest on their respective damage claims.  "[I]n maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp., 71 F.3d 198, 204 (5th Cir. 1995). However,  "[p]eculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by the plaintiff." Reeland Tubing, Inc. v. M/V CHAD G, 794 F.2d 1026, 1028 (5th Cir. 1986).

Awarding pre-judgment interest would be inequitable in this matter because there was a genuine dispute over a good faith claim and mutual fault.  Further, the amount of damages awarded is substantially less than the amounts claimed.  Therefore, this court declines to award pre-judgment interest to either side.

#### 2.  Post-Judgment Interest

Section 1961, Title 28 of the United States code permits the recovery of post-judgment interet, and sets the rate of such interest.  Thus, both St. James and defendants are entitled to interest

on their respective damages awards at the rate established by federal law beginning on the date of this judgment.

**IV.  Conclusion**

    The court finds that St. James was 60% at fault for the allision and Motion and the M/V GEORGITSI were 40% at fault.  Thus, St. James recovery is reduced by 60%, and Motion's recovery is reduced by 40%, of their respective proved damages, as discussed above.

    New Orleans, Louisiana, this   6th  day of August, 2014.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**